**Alison GOODMAN, Plaintiff,**

v.

**Carolyn W. COLVIN, Defendant.**

**Civil Case No. 1:14–cv–996 (RJL–GMH)**

United States District Court,
District of Columbia.

Signed January 9, 2017

Filed January 11, 2017

---

Stephen F. Shea, Elkind & Shea, Silver Spring, MD, for Plaintiff.

Fred Elmore Haynes, U.S. Attorney's Office for the District of Columbia, Washington, DC, Patricia Anne Stewart, Social Security Administration, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

RICHARD J. LEON, United States District Judge

On June 6, 2016, Magistrate Judge G. Michael Harvey's [15] Report and Recommendation was entered. The parties then had 14 days to file objections to the recommendations made by the Magistrate Judge. Fed. R. Civ. P. 59(b)(2). No objections have been filed as of this date. Upon careful consideration of the record in this case and of Magistrate Judge Harvey's [15] Report and Recommendation, the Court ADOPTS and ACCEPTS the Report and Recommendation in full.

Accordingly, the Court shall GRANT defendant's [13] Motion for Judgment of Affirmance and shall DENY plaintiff's [12] Motion for Judgment of Reversal. The Court shall affirm the Commissioner's decision in this matter and this case shall be dismissed in its entirety. An appropriate Order accompanies this Memorandum Opinion.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion issued this day, it is hereby

**ORDERED** that Magistrate Judge G. Michael Harvey's [15] Report and Recommendation is **ADOPTED** and **ACCEPTED** in full, and it is further

**ORDERED** that plaintiff's [12] Motion for Judgment of Reversal is **DENIED**, and it is further

**ORDERED** that defendant's [13] Motion for Judgment of Affirmance is **GRANTED** and that the Commissioner's decision in this matter is **AFFIRMED**, and it is further

**ORDERED** that this case is dismissed in its entirety.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

G. MICHAEL HARVEY UNITED STATES MAGISTRATE JUDGE

This matter was referred to the undersigned for a Report and Recommendation. In this action, Plaintiff Alison Goodman seeks reversal of a decision of the Commissioner of Social Security denying her benefits pursuant to the Social Security Act, 42 U.S.C. § 405(g). Before the undersigned are Plaintiff's motion for judgment of reversal and Defendant's motion for judgment of affirmance. Plaintiff claims that the administrative law judge ("ALJ") erred in determining Plaintiff's residual functional capacity ("RFC") by failing to properly perform a function-by-function assessment of Plaintiff's ability to perform the physical demands of work. Upon review of the entire record,[1] the undersigned recommends that Plaintiff's motion be denied and Defendant's motion be granted.

## BACKGROUND

### A. Legal Framework for Social Security Disability Claims

To be eligible for disability benefits under the Social Security Act, a claimant must be found to be "disabled" by the Social Security Administration ("SSA"). 42 U.S.C. § 423(a). In most cases, to deter-

---

1. The relevant docket entries for purposes of this Report and Recommendation are: (1) Plaintiff's Motion for Judgment of Reversal ("Pl. Mot.") [Dkt. 12]; (2) Defendant's Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal ("Def. Mot.") [Dkt. 13]; and (3) the Administrative Record ("AR") [Dkt. 8].

mine whether a claimant is disabled within the meaning of the Act, an ALJ gathers evidence, holds a hearing, takes testimony, and performs a five-step legal evaluation of the claimant using that evidence. 20 C.F.R. § 404.1520. Specifically, the ALJ must determine whether: (1) the claimant is "presently engaged in substantial gainful activity"; (2) the claimant has a "medically severe impairment or impairments"; (3) the claimant's impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation; (4) the impairment prevents the claimant from performing his past relevant work; and (5) the claimant, in light of his age, education, work experience, and residual functional capacity ("RFC"), can still perform another job that is available in the national economy. Id. The claimant bears the burden of proof in the first four steps of the evaluation. Callahan v. Astrue, 786 F. Supp. 2d 87, 89 (D.D.C. 2011). At step five, however, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform. Id. In making this determination, an ALJ may call a vocational expert ("VE") to testify as to whether a claimant can perform other work that exists in the national economy. Id. at 90.

The parties' dispute here focuses on determination of Plaintiff's RFC. Stated simply, a RFC represents the most a claimant is able to do notwithstanding his physical or mental limitations. See Butler v. Barnhart, 353 F.3d 992, 1000 (D.C. Cir. 2004). According to Social Security Ruling ("SSR") 96-8p, the "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect

his or her capacity to do work-related physical and mental activities" in a work setting for eight hours per day, five days a week, or an equivalent work schedule. Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).[2] Developing an RFC entails a "function-by-function assessment" into a claimant's ability to do work based on all of the relevant medical and nonmedical evidence. Id. at *3.

At the initial and reconsideration stages of a disability claim review, where a disability determination is made by a State agency medical consultant and disability examiner, as was the case here, the State agency medical consultant is responsible for assessing the claimant's RFC based on the medical and nonmedical evidence in its files. 20 C.F.R. § 404.1546(a). At the administrative law hearing stage, responsibility shifts to the ALJ to assess a claimant's RFC and disability. Id. § 404.1546(c). In assessing a claimant's RFC, the ALJ is not bound by State agency consultant's findings. Id. § 404.1527(e)(2)(i)–(ii). Rather, the ALJ must consider those findings as opinion evidence along with all other evidence in the claimant's record bearing on the claimant's RFC. Id. § 404.1512.

In setting forth an RFC determination, the ALJ "must include a narrative discussion" describing (1) how both medical and nonmedical evidence supports the RFC determination and (2) the credibility of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *7; Porter v. Colvin, 951 F. Supp. 2d 125, 131 (D.D.C. 2013). Ultimately, the ALJ's RFC assessment of a claimant "must be based on all of the relevant evidence in the case record." SSR 96–8p,

---

**2.** The SSA publishes SSRs that "are binding on all components of the Social Security Administration. These rulings represent precedent[ial] final opinions and orders and statements of policy and interpretations that [the SSA has] adopted." 20 C.F.R. § 402.35(b)(1).

1996 WL 374184, at *2 (emphasis in original).

Where an ALJ accords significant weight to a State agency physician's assessment in making an RFC determination, the ALJ must give "good reasons" in his or her written decision for the weight he or she assigns it. 20 C.F.R. § 404.1527(d)(2). The reviewing court must determine whether the ALJ "has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits." Lane–Rauth v. Barnhart, 437 F. Supp. 2d 63, 65 (D.D.C. 2006) (quoting Butler, 353 F.3d at 999). If "the evidence is susceptible to more than one rational interpretation, [the Court] must uphold the [Commissioner's] findings if they are supported by inferences reasonably drawn from the record." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).

In making an RFC determination, the ALJ is also responsible for assessing the credibility of a claimant's symptoms by "determin[ing] if the symptoms reported can reasonably be accepted as consistent with the objective medical evidence." Grant v. Astrue, 857 F. Supp. 2d 146, 156 (D.D.C. 2012); See Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96–7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996). The ALJ does so by weighing a number of specific factors, including: "(1) [t]he individual's daily activities, (2) [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms, (3) [f]actors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms, (5) [t]reat-ment, other than medication, the individual receives or has received for relief of pain or other symptoms, (6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . and (7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." Grant, 857 F. Supp. 2d at 156; See SSR 96–7p, 1996 WL 374186, at *3. Generally, a claimant's subjective assessment of his or her symptoms and their functionally limiting effects "may be [deemed] less credible if the level or frequency or treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96–7p, 1996 WL 374186, at *7.

## B. Relevant Facts

### 1. Plaintiff Alison Goodman

At the time of the administrative hearing, Plaintiff Alison Goodman was a 45-year-old woman residing in Washington, D.C. Pl. Mot. at 2. She has an eleventh grade limited education with additional, albeit incomplete,[3] vocational training in nursing. Id. Her employment history includes work as a mental health counselor, teacher's aide, prep cook, food service worker, and office cleaner. Id. On July 7, 2010, Plaintiff reports, she was injured in a work-related accident when she slipped and fell while working as a housekeeper. Id. After the accident, Plaintiff returned to work for one week, from July 12, 2010 through July 16, 2010. AR 341. Other than that one week, Plaintiff has not returned to work. Id. at 47–48, 342.

---

**3.** Plaintiff testified that she did not complete her vocational training at nursing school be-cause the school closed down before her program ended. AR 47.

### 2. Plaintiff's Applications for Benefits

On May 23, 2011, Plaintiff filed an application for benefits under the Social Security Act. Id. at 180–92. Plaintiff alleged disability beginning July 16, 2010, as a result of hip and knee arthritis, a low back injury, diabetes, hypertension, and high cholesterol. Id. In November 2011, the SSA Commissioner denied Plaintiff's claims, finding that she was capable of performing less demanding work. Id. at 70–85. Plaintiff requested reconsideration of that decision. On reconsideration, the Commissioner again denied Plaintiff's claims in January 2011. Id. at 88–105. In May 2012, Plaintiff filed a written request for a hearing before an ALJ, which the Commissioner granted. Id. at 39–69. Plaintiff appeared and testified at a hearing held on March 5, 2013. Id. She fared no better following the hearing. On March 15, 2013, the ALJ denied Plaintiff's claims on the ground that she was capable of performing light and sedentary work available in the national economy. Id. at 16–34. Plaintiff appealed to the Social Security Appeals Council, which denied Plaintiff's request for review, thus rendering the ALJ's March 15, 2013, determination the Commissioner's final decision. Id. at 1–5.

### 3. The Administrative Record

In reaching his decision, the ALJ evaluated Plaintiff's condition based on the evidentiary record comprised of physicians' examining reports; a state agency consultative examination; diagnostic imaging of Plaintiff's right knee, hip, and spine; Plaintiff's own testimony; and the VE's testimony. See id. at 16–34. The undersigned summarizes the relevant portions of the administrative record below.

### a. Physical Health Records

#### i. Dr. King and Dr. Manning – Treating Physicians

Between approximately June 2010 and July 2011, Plaintiff was seen regularly by her treating physicians, Dr. David King and Dr. Lawrence Manning of Capitol Health Management Services, LLC. See id. at 249–346. On July 26, 2010, Plaintiff presented to Dr. King with right hip and back pain and was diagnosed with a lumbar sprain. Id. at 286, 293. Dr. Manning temporarily curtailed Plaintiff's work activity due to the lumbar sprain and pain in her leg. Id. at 304, 336. He also referred Plaintiff for physical therapy. Id. at 263. On August 4, 2010, Dr. Manning recommended that Plaintiff return to work as an office cleaner on August 18, 2010, to perform light duty work, restricted to lifting up to twenty pounds with only limited bending or climbing stairs. Id. at 285–87, 290. Plaintiff did not, however, return to work. Id. at 47–48, 342.

In September 2010, Plaintiff returned to Dr. Manning for a follow-up and insisted that her low back pain continued, though, contrary to her physician's instructions, she had not yet started physical therapy. Id. at 282. In October 2010, Plaintiff reported to Dr. Manning that her lower back and right hip pain had improved following physical therapy. Id. at 280. Dr. Manning advised Plaintiff to continue with physical therapy and with her light duty work restrictions. Id.

Following a return visit in February 2011, Dr. Manning opined that Plaintiff could perform light duty work limited to lifting twenty pounds with no squatting. Id. at 252. He also referred Plaintiff to an orthopedist, Dr. Aham Onyike, for "possible arthroplasty."[4] Id. at 250. Though

---

**4.** Arthroplasty is a "surgical procedure to restore the function of a joint." Johns Hopkins Medicine Health Library, accessed at http://www.hopkinsmedicine.org/healthlibrary. The record is unclear as to which joints Dr. Manning thought may have possibly required replacement.

Plaintiff did not immediately report to Dr. Onyike for unspecified "personal reasons," she eventually saw Dr. Onyike two years later in January and February of 2013. Id. at 388–92.

In July 2011, Dr. Manning completed the portion of Plaintiff's application for MetroAccess paratransit services that was reserved for physician input. Id. at 328–31. On the form, Dr. Manning checked a box indicating that Plaintiff required a support cane as a mobility aide. Id. at 329.

### ii. CNP Numu Kamara – Certified Nurse Practitioner

In July 2011, Plaintiff sought treatment from Numu Kamara, a Certified Nurse Practitioner ("CNP") at Perry Family Health Services. Id. at 376. Plaintiff presented with right ear pain and requested a refill of her diabetes medication. Id. CNP Kamara opined that Plaintiff's diabetes was uncontrolled, but noted that Plaintiff refused regular insulin. Id. Later in July, Plaintiff returned to CNP Kamara for a follow-up on her diabetes and hypertension conditions, and again presented with right knee and right hip pain. Id. at 375. CNP Kamara found Plaintiff's right knee to be tender. Id. In a visit two weeks later, Plaintiff reported that her vision was blurry but denied that she had any other problem. Id. at 374.

In September 2011, Plaintiff returned to Perry Family Health Services for a refill of her diabetes medication and again denied that she had any other problem. Id. at 373. During a follow-up visit in November 2011, CNP Kamara found that Plaintiff's diabetes and hypertension were controlled and recommended that Plaintiff stay on her current medications. Id. at 372. CNP Kamara also found that Plaintiff had right knee pain, referred her to an orthopedist, and recommended that Plaintiff take Tylenol for the pain. Id. CNP Kamara's progress notes from a February 6, 2012 follow-up visit make no mention of Plaintiff's right knee, hip, or back conditions. See id. One week later, Plaintiff underwent a full physical examination. Id. at 367. Regarding Plaintiff's musculoskeletal conditions, CNP Kamara's notes only mention that Plaintiff had neither crepitus nor edema, and had an active range of motion. Id. at 367.

In March 2012, Plaintiff underwent X-rays of her knees, hips, and lower back. Id. at 359–62. Imaging of the lumbar spine revealed six lumbar vertebral bodies, slight curvature in the spine, small anterior osteophytes[5] at multiple levels, and no acute abnormality. Id. at 360. Imaging of Plaintiff's pelvis and hips revealed "severe degenerative arthritis in the right [hip]," obliteration of the joint space, eburnation[6] and spur formation, "mild degenerative arthritis on the left with slight joint narrowing," small spur formation, and minimal eburnation. Id. Imaging of Plaintiff's right knee revealed "moderate to large femoral patellar osteophytes" with "moderate osteophyte formation along the lateral joint line" and "small osteophyte formation medially." Id. at 362. Imaging of Plaintiff's right knee also revealed hypertrophy[7] of the lateral tibial spine. Id. Upon reviewing these results, CNP Kamara recommended that Plaintiff use Motrin for her lower

---

**5.** Osteophytes are a bony outgrowth associated with the degeneration of cartilage at joints. Johns Hopkins Medicine Health Library, accessed at http://www.hopkinsmedicine.org/healthlibrary/conditions.

**6.** Eburnation is "[a] change in exposed subchondral bone in degenerative joint disease in which it is converted into a dense substance with a smooth surface like ivory." Stedman's Medical Dictionary 276320 (2014).

**7.** Hypertrophy is the general increase in bulk of a part or organ, not due to tumor formation. Stedman's Medical Dictionary 425300 (2014).

back and right knee pain and that Plaintiff return for a checkup in three months. Id. at 359.

### iii. Dr. Elliott Aleskow – State Agency Physician

In November 2011, State agency physician Dr. Elliot Aleskow administered a consultative examination of Plaintiff. Id. 347–53. At the time, Plaintiff was 5'9" and weighed 308 pounds. Id. at 348. Plaintiff told Dr. Aleskow that she had been experiencing back pain radiating to her hip for one year, which occurred while sitting, standing, walking, and climbing five steps. Id. at 347. She also stated that she had been experiencing right hip pain radiating to her right knee for one year, which occurred when bending, stooping, sitting, standing, walking, and climbing five steps. Id. Plaintiff denied experiencing any swelling. Id.

An X-ray of Plaintiff's lumbosacral spinal region revealed "mild diffuse facet degenerative hypertrophy," but no fractures, dislocations, or other boney abnormalities. Id. at 351. Dr. Aleskow noted that Plaintiff's diabetes was not controlled with her medication. Id. at 347. Though Plaintiff contended that she experienced dizziness a few times per week, Dr. Aleskow found that Plaintiff did not suffer from any significant complications as a result of her diabetes or hypertension. Id. at 349.

Dr. Aleskow examined Plaintiff's extremities and found that she had a normal range of motion in all extremities with the exception of both knees and her lumbosacral spine area. Id. at 349. Specifically, Plaintiff's right knee flexion was between eighty and ninety degrees and her left knee flexion was between 125 and 135 degrees, out of a possible 150 degree range of motion. Id. at 353. Flexion of her spine was determined to be eighty degrees of a possible ninety degrees. Id.

Dr. Aleskow also noted that Plaintiff experienced difficulty walking on her heels and toes, squatting, and rising from a squatting position. Id. at 348. She also experienced mild difficulty walking in a straight line. Id. In spite of these observations, Dr. Aleskow concluded that Plaintiff did not require an assistive device for walking because Plaintiff had represented that she could sit for fifteen minutes, stand for ten minutes, walk one to two blocks, and had no difficulty traveling without assistance. Id. Plaintiff also stated that she could lift five pounds, carry two lightweight packages in each hand, and had no difficulty hearing or speaking. Id.

### iv. Dr. James Grim – State Agency Physician

Also in November 2011, Dr. James Grim, on behalf of the Commissioner, reviewed Plaintiff's medical records and assessed Plaintiff's functional limitations and vocational factors. Id. at 70–84. At the time, the record before Dr. Grim included Dr. Aleskow's consultative examination report, id. at 347–53, medical evidence collected from Capitol Health Management Services, id. at 249–346, Plaintiff's function report, id. 219–26, and her work history report, id. at 211–18. Dr. Grim also noted that Plaintiff had reported that she did not require an assistive device for walking, though she could only walk one to two blocks. Id. at 73. In his assessment reports, Dr. Grim opined that "one or more of the [Plaintiff's] medically determinable impairment(s) ... [could] reasonably be expected to produce [her] pain or other symptoms" and that her "statements about the intensity, persistence, and functionally limiting effects of [her] symptoms [were] substantiated by the objective medical evidence alone[.]" Id. at 74, 82.

Dr. Grim concluded that "[Plaintiff] is obese with decreased [range of motion] in her knees and [lumbar spine]." Id. at 73. He opined that Plaintiff could sit for about six hours in an eight hour day, and stand

and/or walk for about six hours in an eight hour day. Id. He further opined that Plaintiff had pushing and pulling limitations in the lower-right extremity, could lift ten pounds frequently and twenty pounds on occasion, and could occasionally perform a full range of postural maneuvers except that she must never crawl or climb ladders, ropes, or scaffolds due to obesity and back pain. Id. While Dr. Grim noted that Plaintiff had difficulties walking on her heels and toes, he observed that she had a normal gait and did not require an assistive device for ambulation. Id.

Dr. Grim ultimately concluded that Plaintiff was not disabled. Id. at 77. He found that Plaintiff's back injury, knee arthritis, diabetes, high blood pressure, and high cholesterol resulted in some limitations in Plaintiff's ability to perform work-related activities, but, while Plaintiff was "not capable of performing work [she had] done in the past," she was capable of performing "work that is less demanding." Id.

### v. Dr. Earl Nicholas – State Agency Physician

In April 2012, following Plaintiff's request for reconsideration, Dr. Earl Nicholas, a State agency consulting physician, completed an additional disability determination report. Id. at 88–105. Though the medical evidence comprising Plaintiff's record had not changed since November 30, 2011, Plaintiff maintained that her condition had worsened. Id. at 89. Specifically, Plaintiff contended that she was experiencing constant pain in her right and left hip, pain in her back, and was having trouble standing for a long period of time after taking insulin around July 13, 2011. Id. Like Dr. Grim, Dr. Nicholas found that "one or more of the [Plaintiff's] medically determinable impairment(s) ... [could] reasonably be expected to produce [her] pain or other symptoms" and that the objective medical evidence substantiated her "statements about the intensity, persis-

tence, and functionally limiting effects of the symptoms[.]" Id. at 92, 101. Dr. Nicholas' findings with respect to Plaintiff's RFC were identical to Dr. Grim's – that Plaintiff had a limited range of motion in her knees and lumbar spine, partly explained by her obesity; that she could sit for about six hours in an eight hour day and stand and/or walk for about six hours in an eight hour day; that she could lift ten pounds frequently and twenty pounds on occasion; that she could occasionally perform a full range of postural maneuvers with the exceptions that she must never crawl or climb ladders, ropes, or scaffolds due to obesity and back pain; and that she did not require an assistive device for ambulation. Id. at 92–93. Ultimately, Dr. Nicholas, like Dr. Grim, concluded that while Plaintiff was "not capable of performing work [she had] done in the past," she was capable of performing "work that is less demanding." Compare id. at 71–72, 89–90 with 89–91, 98–100.

### vi. Dr. Aham Onyike – Treating Physician

In January 2013, Plaintiff presented to Dr. Onyike, an orthopedist at Howard University Hospital. Id. at 391–92. Plaintiff related a history of bilateral hip pain, low back pain, and right knee pain. Id. at 391. Plaintiff mentioned to Dr. Onyike that Dr. Manning had previously prescribed over-the-counter, anti-inflammatory medications, which she did not like to take. Id. Dr. Onyike described Plaintiff as "morbidly obese" with "bilateral hip pain, right knee pain, and lumbar spine pain." Id. at 392. Dr. Onyike found no tenderness to palpitation of the spine. Id. Similarly, though Plaintiff reported right hip pain, Dr. Onyike found no tenderness to palpitation of the hip. Id. Plaintiff's range of motion of her right hip was "limited by obesity" to seventy-eight degrees in flexion. Id. Plaintiff reported no left hip pain,

though Plaintiff's left hip range of motion was also "limited by obesity" to seventy degrees in flexion. Id. Upon examination of Plaintiff's right knee, Dr. Onyike found limited range of motion at 120 degrees of flexion of a possible 150 degrees. Id. Dr. Onyike described Plaintiff as having symptomatic arthritis of the hip and knee but noted that there was no symptomatic pain in the lumbar spine. Id.

At a follow-up visit with Dr. Onyike in February 2013, Plaintiff rated her pain when walking as a nine out of ten, but she also admitted that she was not taking any prescription medication. Id. at 388–89. An examination revealed that the range of motion of Plaintiff's right hip flexion was seventy degrees. Id. The range of motion of Plaintiff's right knee was 120 degrees. Diagnostic imaging of Plaintiff's hips revealed moderate to severe degenerative joint disease in her right hip along with osteophytes, decreased joint space, and subchondral sclerosis. Id. Diagnostic imaging of Plaintiff's left hip revealed mild degenerative joint disease with valgus deformity and decreased joint space. Id. Dr. Onyike ultimately diagnosed Plaintiff with right hip and knee degenerative joint arthritis. Id. He administered joint injections to the Plaintiff's right hip for symptom relief. Id. at 389–90. Dr. Onyike scheduled Plaintiff for a follow-up to receive an additional injection to her right hip. Id. at 390. The record is silent as to whether Plaintiff returned to receive the injections.

### b. Plaintiff's Testimony

Plaintiff testified at the hearing that she attended and completed school up to the twelfth grade but stopped going to school when she became pregnant. Id. at 47. She also attended nursing vocational school and worked as a prep cook, daycare aid, mental health counselor, and office cleaner. Id. at 47–49, 51. These tasks sometimes entailed heavy lifting and standing for a while – as a daycare aid, she occasionally lifted infants and toddlers weighing up to twenty pounds; as a mental health counselor, she pushed patients in wheelchairs and helped them in and out of their wheelchairs; as a prep cook, she often lifted up to twenty-five pounds of frozen food; and as an office cleaner, she sometimes carried up to thirty pounds. Id. at 49–50. According to Plaintiff, she stopped working full-time in 2008 and stopped working altogether in July 2010, soon after she sustained her injury. Id. Plaintiff later explained that she stopped working because her positions were temporary. Id. at 48. Plaintiff has not looked for work since July 2010. Id. at 48.

At the hearing, Plaintiff represented that her height is 5'10" and that she weighs 305 pounds. When she filed her claim, Plaintiff had reported weighing 417 pounds, but at the hearing, she clarified that her weight was closer to 317, not 417. Id. at 43. Regarding her activities of daily living, Plaintiff testified that she is divorced and lives in an apartment with her 20-year-old daughter, 21-year-old son, and 5-year-old grandchild. Id. at 43–44. According to Plaintiff, three times per week she leaves her apartment and, upon returning, climbs approximately thirty-four stairs to her apartment unit on the third floor. Id. at 44–45. With regard to household chores, she cooks, rinses the dishes and loads them in the dishwasher, sweeps the kitchen, sometimes runs errands to shop for groceries and clothing, launders clothing, occasionally makes her bed, and sometimes looks after her grandson. Id. at 58–60, 62. Despite her ability to perform these tasks, Plaintiff averred that when cooking, she takes breaks to sit down every ten minutes, and when laundering clothing, her daughter carries the laundry basket for her. Id. at 62–63.

She also noted that she sometimes experiences problems dressing and undressing

herself, though she has no trouble bathing herself. Id. at 60. Plaintiff stated that she does not struggle to pay attention – she watches television and reads. Id. at 59. She is able to ride the bus, though walking to the bus station is sometimes difficult. Id. at 46. When she gets rides from others, she experiences no trouble entering or exiting a vehicle. Id. Indeed, to get to the hearing, her friend gave her a ride in a vehicle for approximately forty-five minutes without any trouble, though Plaintiff noted that she only felt "[a] little bit" comfortable during the drive. Id.

Plaintiff explained that generally she is able to walk ten to fifteen minutes at a time, stand for up to fifteen minutes at a time, sit for ten or fifteen minutes at a time, bend over and touch her knees, bend her left knee but not her right knee, raise her arms over her head, use her hands and fingers without difficulty, and push and pull using her arms and hands. Id. at 55–56. Though she stated that she could only lift five pounds, she admitted that her doctor told her that she could actually lift ten pounds. Id. at 54–55.

Despite her functional abilities, Plaintiff testified that it hurt to climb the stairs and that she was in pain all of the time. Id. at 53, 56–57. She also noted that she has trouble sleeping at night due to muscle spasms though she does not take any medication to help her sleep. Id. at 57. She testified that, for her pain, she has a prescription for Naproxen that is being filled, but she typically takes Motrin to alleviate her back, hip, and knee pain, which helps "just a little." Id. at 53. According to Plaintiff, Motrin typically takes a day to take effect, but when activated, it lasts for about four hours before the pain returns. Id. When asked whether she had taken any Motrin that day, Plaintiff responded in the negative. Id. at 54.

### c. The VE's Testimony

The ALJ also took testimony from an independent VE, Dr. James Ryan, who indicated that he had familiarized himself with Plaintiff's vocational history. See id. at 52, 64–68. The VE classified Plaintiff's prior work as follows: her work as a mental health counselor was semiskilled, requiring a medium level of physical exertion; her work as a teacher aide was semiskilled, requiring a light level of physical exertion; her work as a prep cook was unskilled, requiring a medium level of physical exertion; and her work as an office cleaner was unskilled, requiring a light level of physical exertion. Id. at 52.

The ALJ then asked the VE if he could identify any jobs in the national economy that a hypothetical person with the same RFC, age, education, and work experience as Plaintiff could perform. Id. at 64–68. Specifically, the ALJ asked the VE to consider two hypothetical questions regarding the availability of work for persons with increasing degrees of impairments similar to those claimed by Plaintiff. Id.

In the first hypothetical, the ALJ described a person with the ability to lift up to ten pounds frequently, but no more than twenty pounds on occasion, and the ability to walk or stand with normal breaks for no more than two hours out of an eight hour day. Id. at 64. In response to the first hypothetical, the VE represented that, absent any other exertional limitations, the hypothetical person could perform less than full-range, light and sedentary work. Id. at 64–65.

For the second hypothetical, the ALJ described a person of similar age, education, and training as Plaintiff with an RFC to perform light and sedentary work and some additional limitations. Id. at 65. These additional limitations restricted the

hypothetical person to an occupation where he occasionally used stairs and ramps, balanced, bended, stooped, kneeled, crouched, or squatted; avoided ladders, ropes, or scaffolds; avoided crawling and concentrated exposure to hazards such as moving machinery and unprotected heights; and incorporated a limitation in the ability to keep pace. Id.

The ALJ acknowledged that these limitations would inevitably result in some reduction in productivity and asked the VE to what extent an employer would tolerate the same. Id. The VE responded that a "twenty percent reduction [in productivity] would render the hypothetical person unemployable." Id. at 66. If, in the converse, the hypothetical person's productivity remained above eighty percent, that person could not return to Plaintiff's past relevant work but could perform other work at the unskilled, light and sedentary levels. Id. In particular, the VE testified that thirty percent of the 1,400 light, unskilled occupations would remain as would seventy percent of the 200 unskilled, sedentary occupations. According to the VE, such occupations included but were not limited to: General Office Helper (light), Machine Tender (light), Quality Control Worker (sedentary), and Small Parts Inserter (sedentary). Id. at 67. The VE further testified that if Plaintiff's testimony about her impairments was found to be credible and supported by medical evidence, there would be no jobs in the economy that Plaintiff could perform. Id. at 68.

#### 4. The ALJ's Decision

Based on Plaintiff's medical records and the testimony at the hearing, the ALJ found on March 15, 2013, that Plaintiff was not disabled as defined by the Social Security Act and thus not entitled to the benefits she seeks. Id. at 32–33. Running the five-step analysis, the ALJ first found that Plaintiff had not "engaged in substantial gainful activity since July 16, 2010, the alleged onset date[.]" Id. at 19. Second, the ALJ found that Plaintiff had the following severe impairments, which "cause more than minimal functional limitations on the claimant's ability to perform basic work activities": hypertension; diabetes; disorders of the knee, back, and hip; and obesity. Id. Third, the ALJ explained at length his determination that Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, despite Plaintiff's obesity. Id.

Because Plaintiff's impairment did not meet an impairment pre-defined in the regulations, the ALJ then considered the record evidence to arrive at Plaintiff's RFC. Id. at 21–32. The ALJ acknowledged Plaintiff's pain from her degenerative joint disease and arthritic changes, reflected clearly in the March 2012 diagnostic test. Id. at 26. While not denying that Plaintiff experiences such pain, he found that Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely credible." Id. at 25. According to the ALJ, Plaintiff's statements concerning her pain were undermined by the fact that Plaintiff's preferred treatment was "essentially routine and conservative in nature." Id. at 25. The alleged severity of the pain that Plaintiff described was inconsistent with the "not significantly strong" medicine she used to treat it: over-the-counter medication such as Tylenol and Motrin. Id. at 25, 31. The ALJ noted:

In contrast to the over-the-counter pain management regimen employed for her musculoskeletal limitations, the claimant was prescribed Tylenol # 3 for body aches when she presented with a sinus infection. That the claimant prefers a more benign over the counter modality for managing the severe chronic musculoskeletal pain she reported, yet was prescribed a stronger medication for

myalgias related to a transient respiratory illness, supports an inference that the claimant's musculoskeletal symptoms are more amenable to treatment that [sic] she currently contends.

Id. at 25.

The ALJ further reasoned that Plaintiff's statements about the severity of her conditions were undermined by the fact that she did not comply with all prescribed treatments. Id. For example, the ALJ noted that Plaintiff delayed physical therapy following her July 2010 fall until September or October of that year. Id. at 25. And, although Dr. Manning referred Plaintiff for evaluation for "possible" arthroplasty, there is no evidence that Plaintiff ever followed through with the referral. Id. She nonetheless represented in her Functional Report form that she received a doctor's recommendation for knee and hip replacement – a recommendation the ALJ observed was missing in her medical records. Id.

Plaintiff's statements concerning her subjective symptoms were further undermined in the ALJ's eyes by her testimony on the "broad range of activities" she was able to perform – cooking, cleaning, sweeping, using public transportation, climbing stairs, etc. Id. at 24, 26. In addition, the fact that Dr. Onyike, Plaintiff's 2012 treating physician, maintained Plaintiff's conservative treatment plan "buttressed" earlier physicians' opinions – Dr. Manning's in particular – that Plaintiff was capable of returning to light duty work. Id. at 32. The ALJ further considered the opinions of Drs. Grim and Nicholas that Plaintiff could return to work that is less demanding than her previous work. Id. The ALJ explained that he accorded "great weight" to their opinions considering that they were "well-reasoned, well-documented, and not inconsistent with the recommendation of Dr. Manning, claimant's treating orthopedist,

who permitted [Plaintiff] to do work involving light exertion." Id. at 25.

Based on this entire record, the ALJ concluded that. Plaintiff had the RFC to perform "light work" with some additional limitations. Id. at 21. These additional limitations included: (1) that Plaintiff "can lift 10 pounds frequently or 20 pounds on occasion," (2) that she can "walk or stand for no more than two hours in an eight hour day," (3) that she "must never crawl or climb ladders, ropes, or scaffolds, but she can occasionally climb stairs or ramps, balance, bend or stoop, kneel, crouch, or squat," (4) that she "must avoid concentrated exposure to operating machinery or unprotected heights," and (5) that her ability to keep up a pace is limited. In sum, the ALJ found that "the cumulative effect" of these additional limitations "is that productivity is reduced, but [that] the claimant can remain productive more than 80% of the time." Id.

Having established Plaintiff's RFC, the ALJ then determined at step 4 of the analysis that Plaintiff was unable to perform past relevant work. Id. at 32. Finally, again with the assistance of the VE's testimony, the ALJ determined under the fifth step that Plaintiff was able to perform jobs available in significant numbers in the national economy, including the representative occupations of general office helper, machine tender, quality control worker, and small parts inserter. Id. at 33. As a result, the ALJ found that Plaintiff was not disabled and denied her applications for benefits. Id.

### 5. Plaintiff's Complaint in the District Court

Having exhausted her administrative remedies, Plaintiff commenced this action in this Court under 42 U.S.C. § 405(g), seeking review of the Commissioner's denial of her claim for disability benefits. She requests that the Court reverse the Com-

missioner's decision, or alternatively, issue an order remanding the case to the Commissioner for a new administrative hearing. Pl. Mot. at 1.

## LEGAL STANDARD

A district court has jurisdiction over a civil case challenging a final decision of the Commissioner. 42 U.S.C. § 405(g). The court has the authority to reverse or remand the Commissioner's decision if it is not supported by substantial evidence or is not made in accordance with applicable law or regulations. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Simms v. Sullivan, 877 F.2d 1047, 1047 (D.C. Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (citation and quotation marks omitted). Substantial evidence requires "more than a mere scintilla of evidence, but can be satisfied by something less than a preponderance of the evidence." Fla. Mun. Power Agency v. Fed. Energy Regulatory Comm'n, 315 F.3d 362, 365–66 (D.C. Cir. 2003). "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ." Crosson v. Shalala, 907 F. Supp. 1, 2 (D.D.C. 1995). The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." Id. Rather, the reviewing court must determine whether the ALJ "has analyzed all evidence and has sufficiently explained that weight he [or she] has given to obviously probative exhibits." Lane-Rauth v. Barnhart, 437 F. Supp. 2d 63, 65 (D.D.C. 2006) (internal quotation omitted); see also Butler v. Barnhart, 353 F.3d 992, 999 (D.C. Cir. 2004) (finding that the district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are based on substantial evidence and a correct interpretation of the law).

The plaintiff bears the burden to prove that the Commissioner's decision is not supported by substantial evidence. Callahan, 786 F. Supp. 2d at 93; Brown v. Barnhart, 408 F. Supp. 2d 28, 31 (D.D.C. 2006). The D.C. Circuit has instructed that "[i]f the case is one that involves the taking of additional evidence for any reason, the district court is obligated to obtain an enhancement or revision of the record by way of remand to the [Commissioner]" rather than outright reversal. Callahan, 786 F. Supp. 2d at 93 (quoting Ignoia v. Califano, 568 F.2d 1383, 1389 (D.C. Cir. 1977)).

## DISCUSSION

In the instant action, Plaintiff contends that the ALJ failed to properly perform a function-by-function RFC assessment of Plaintiff's ability to perform the physical demands of work in five ways. First, Plaintiff challenges the ALJ's reliance on two non-examining State agency physician reports that Plaintiff contends were incomplete. Pl. Mot. at 6–7. Second, Plaintiff argues that the ALJ overlooked elements of these State agency physician reports that, in Plaintiff's eyes, contradict the ALJ's RFC determination. Id. at 7. Third, Plaintiff argues that the ALJ failed to properly incorporate into Plaintiff's RFC analysis Dr. Manning's recommendation that she use a support cane. Id. Fourth, Plaintiff argues that the ALJ erroneously relied on Dr. Manning's findings that Plaintiff was capable of light duty work. Id. at 7–8. Lastly, Plaintiff contends that the ALJ failed to set forth a narrative discussion in his decision showing how the evidence supported his conclusion that Plaintiff can be productive more than eighty percent of the workday. Id. at 9–10. The undersigned will only address these specific contentions, bearing in mind that the court's role when reviewing the Commissioner's disability decisions is "not to

determine ... whether [Plaintiff] is disabled," but to "assess only whether the ALJ's finding that [Plaintiff] is not disabled is based on substantial evidence and a correct application of the law." Butler, 353 F.3d at 999.

### A. The ALJ's Reliance on Dr. Grim's and Dr. Nicholas' State Agency Assessment Reports Was Appropriate.

The ALJ, in conducting his own RFC analysis of Plaintiff, accorded "great weight" to the RFC assessments of Dr. Grim and Dr. Nicholas, finding their reports to be "well-reasoned, well-documented," and consistent with Plaintiff's medical records, hearing testimony, and the recommendation of her treating physician, Dr. Manning. AR 31–32, 285. Plaintiff contends that the ALJ erred in so relying on Drs. Grim and Nicholas because both of their assessments predated the March 26, 2012, diagnostic testing, which "revealed moderate to large femoral patellar osteophytes, with moderate osteophyte formation along the lateral joint line." Pl. Mot. at 6–7; AR 30. The undersigned finds Plaintiff's argument unavailing.

At the administrative hearing level of the disability claims process, the ALJ is responsible for assessing and determining a claimant's RFC. 20 C.F.R. § 404.1546(c). In so doing, the ALJ is not bound by any previously conducted State agency medical consultant's RFC assessments, but the ALJ is nonetheless required to consider and evaluate any such assessments as opinion evidence. Id. § 404.1527(e)(2)(i)–(ii); see also Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review, SSR 96-6p, 1996 WL 374180, at *2 ("Because State agency medical ... consultants ... are experts in the Social Security disability programs, ... 20 C.F.R. §§ 404.1527(f) and 416.927(f) require [ALJs] ... to consider their findings of fact about the nature and severity of an individual's impairment(s)."). It is then up to the ALJ to decide what weight to allot each piece of evidence. Id.

New medical evidence introduced into the record after a State agency consultant's assessment does not automatically render that assessment invalid. After all, "[t]here is almost always additional evidence submitted after the state agency physician issues his [or her] opinion and before the ALJ's decision is rendered." Quarrels v. Astrue, No. 4:10-846-DGK-SSA, 2012 WL 398597, at *2 (W.D. Mo. Feb. 7, 2012). To rectify the issue, the ALJ has simply to consider the new medical evidence in addition to the State agency physicians' assessments. See, e.g., Wilson v. Astrue, 331 Fed.Appx. 917, 919 (3d Cir. 2009) (upholding the ALJ's decision because the ALJ discussed MRI results not considered by the State agency physician and "properly took this medical evidence into account when making his decision"); Sportsman v. Colvin, No. 13-36063, 2016 WL 146030, at *2 (9th Cir. Jan. 11, 2016) (finding that the ALJ did not err in according "substantial weight" to a State agency physician's assessment that predated a year's worth of medical evidence because the ALJ "reviewed [the] entire medical history" and "came to a rational conclusion" regarding the plaintiff's limitations); Thacker v. Astrue, No. 11–246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011) ("The fact that the state agency physician did not have access to the entire evidentiary record because the record was incomplete at the time of the assessment is inconsequential as the ALJ considered the entire evidentiary record and substantial evidence supports his [RFC] determination."). Thus, there is "no requirement that

an ALJ must always receive an updated report from the State medical experts whenever new medical evidence is available." Wilson, 331 Fed.Appx. at 919 (citing 20 C.F.R. § 404.1527(f)(2)(i)). An ALJ is required to order consultative examinations only "[i]f the information ... need[ed] is not readily available from the record of [the plaintiff's] medical treatment source." 20 C.F.R. §§ 404.1512(f), 416.912(f); see also Clark v. Astrue, 826 F. Supp. 2d 13, 24 (D.D.C. 2011) (finding the ALJ was not required to order a consultative examination where there was "nothing in the record indicating that the ALJ deemed the evidence insufficient to render his decision").

 Here, complying with 20 C.F.R. § 404.1527(e)(2)(i)–(ii), the ALJ considered and evaluated the RFC assessments conducted by State agency consultants Dr. Grim and Dr. Nicholas. See AR at 29–32. He accorded them "great weight," not just because of the integrity of the reports themselves, but also because they were consistent with treating physician Dr. Manning's opinions and were "buttressed" by treating physician Dr. Onyike's conservative treatment of Plaintiff, which followed Plaintiff's March 2012 diagnostic test results. Id. at 32. Based on that record, the undersigned finds no error in the ALJ's determination to give "great weight" to the opinion of the State agency consultants.

Moreover, contrary to Plaintiff's assertion, the ALJ did in fact consider the March 2012 testing results. Id. at 30. Indeed, the ALJ discussed those results at length when reviewing the medical evidence. See id. Most importantly, these test results show what the ALJ himself acknowledged – that Plaintiff does, in fact, suffer from certain medical impairments and degenerative changes, including arthritic changes in the hip, knee, and spine. Id. at 26. The issue in this case is the extent to which those impairments functionally limit Plaintiff's ability to work. The March 2012 test results alone do not speak to those functional limitations. The ALJ determined these limitations after reviewing not just those test results, but also the State agency assessments, Plaintiff's treating physicians' medical opinions and treatment, and other objective medical evidence in the record. See id. at 22–31. Thus, the ALJ "properly took [the March 2012 diagnostic testing] into account when making his [RFC] decision," Wilson, 331 Fed. Appx. at 919; 20 C.F.R. § 404.1527(f)(2)(i), and there was no need for the ALJ to obtain an updated report from State agency consultants following the March 2012 testing.

"The fact that additional medical evidence was added to the record after those opinions renders them no less valid as of the dates they were written." Etheridge v. Comm'r of Soc. Sec., Civil Case No. JKB-15-697, 2015 WL 6769116, at *2 (D. Md. Oct. 30, 2015). The regulations simply require the ALJ to make decisions supported by substantial evidence, and which consider the entire record including both the State agency assessments, 20 C.F.R § 404.1527(e)(2)(i)–(ii), and the additional March 2012 test results, SSR 96–8p, 1996 WL 374184, at *2. It is clear from the ALJ's decision that he did just that.

## B. The ALJ's Credibility Determination is Based on Substantial Evidence

 Plaintiff also challenges the ALJ's assessment of Plaintiff's subjective evaluation of her alleged symptoms. Specifically, Plaintiff argues the ALJ overlooked the fact that both Dr. Grim and Dr. Nicholas determined that Plaintiff's subjective assessment of the intensity, persistence, and functionally limiting effects of her alleged symptoms and pain were substantiated by

the objective medical evidence. Pl. Mot. 7. Again, Plaintiff's assertion misses the mark.

A symptom is "an individual's own description of his or her physical or mental impairment." Titles II & XVI: Assessing the Credibility of an Individual's Statements, SSR 96-7p, 1996 WL 374186, at *2. The ALJ engages in a two-step process to assess the credibility of a claimant's evaluation of the limiting effects of his or her symptoms. First, the ALJ must consider whether there is an "underlying medically determinable physical or mental impairment(s) ... that could reasonably be expected to produce the individual's pain or other symptoms." Id. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id.

▮▮▮▮▮ At the second step, the ALJ evaluates the claimant's credibility regarding the alleged limiting effects of her symptoms "based on a consideration of the entire record." Id. That credibility determination is "solely within the realm of the ALJ." Grant, 857 F. Supp. 2d at 155–56. A reviewing court will only intercede "where an ALJ fails to articulate a rational explanation for his or her finding." Id. In other words, "deference should be given to the ALJ in the determination of whether a claimant's alleged pain is credible, allowing the ALJ to weigh some opinions more heavily than others." Thomas v. Astrue, 677 F. Supp. 2d 300, 308 (D.D.C. 2010). Some specific factors an ALJ may consider in assessing a claimant's credibility regarding her symptoms include:

(1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms ...; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186 at *3. For example, an ALJ may assess a claimant's credibility by comparing her subjective complaints of pain with her own statements regarding her daily activities. See Grant, 857 F. Supp. 2d at 156 (finding that ALJ properly considered claimant's reports of daily activities when assessing claimant's complaints of pain). An ALJ may also situate a claimant's limitations within the context of a claimant's subsequent success with medication and the extent to which the disabling pain is controlled with treatment. See Hartline v. Astrue, 605 F. Supp. 2d 194, 206 (D.D.C. 2009) (finding that the ALJ appropriately considered claimant's complaints "to be only fair at best" when the ALJ noted, among other factors, the effectiveness of medication in alleviating claimant's symptoms). And the ALJ may consider the strength of the medication taken to assess the severity of the alleged symptoms. See Payne v. Shalala, Civ. A. N. 93-0288 (NHJ), 1993 WL 405747, at *3 (D.D.C. Sept. 24, 1993) (affirming the ALJ's credibility determination, which was based in large part on the fact that plaintiff took over-the-counter pain medications instead of prescription drugs and was capable of performing some housework, cooking, and grocery shopping).

Here, at the first step, the ALJ properly determined that Plaintiff's medically determinable impairments could reason-

ably be expected to cause her alleged symptoms. AR 25. At the second step, the ALJ correctly evaluated some of the aforementioned factors and found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms "not entirely credible" for several reasons. First, the ALJ noted that Plaintiff's treatment was "essentially routine and conservative in nature" – it was "not significantly strong," over-the-counter medication. Id. at 25, 31. To illustrate the point, the ALJ contrasted the relatively benign medication Plaintiff preferred for her allegedly debilitating musculoskeletal pain with the stronger medication Plaintiff used for a respiratory illness. Id. at 25. The ALJ also considered Plaintiff's daily activities and noted that she could perform numerous regular tasks and household chores – climbing stairs, cooking while taking occasional breaks, sweeping the kitchen, rinsing dishes and loading the dishwasher, occasionally grocery shopping, etc. Id. at 24–26.

The ALJ also factored into his decision the fact that Plaintiff did not follow all prescribed treatments. Id. at 25; see SSR 96-7p, 1996 WL 374186, at *7 ("[T]he individual's statement may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). Specifically, the ALJ notes that soon after her injury, Dr. Manning referred Plaintiff to physical therapy, anticipating that she would be able to reach maximum medical improvement within three months if she stayed the course. But Plaintiff delayed starting physical therapy until sometime between her September 2010 doctor's appointment and her October 2012 doctor's appointment. Id. at 27. At the October 2012 doctor's appointment, Plaintiff admitted that once she eventually started physical therapy, as instructed by her doctor, she felt better and the pain in her low back and hip had improved. Id. at 280. In another instance of non-compliance, Plaintiff was referred by Dr. Manning for evaluation for "possible arthroplasty" in February 2011, but there is no evidence that Plaintiff followed through with this referral. Id. at 26.

Under 20 C.F.R. § 404.1530, failure to follow a prescribed treatment plan is a basis for denying a claimant benefits when the treatment plan would restore the claimant's ability to work. 20 C.F.R. § 404.1530. Here, the ALJ considered whether there was some reasonable explanation for Plaintiff's non-compliance with her physician's treatment plan to facilitate an expeditious recuperation. AR 26. Upon confirming that Plaintiff maintained health insurance coverage, the ALJ properly factored her failure to cooperate with her physician's treatment plan and recommendations into his credibility determination, finding that Plaintiff's conduct "undermines the credibility of her statements regarding the severity of her subjective impairment." Id. at 26, 28.

"While contradictory evidence" on the nature of Plaintiff's symptoms "may exist" – namely, Dr. Grim's and Dr. Nicholas' own credibility determinations of Plaintiff – Plaintiff's credibility is ultimately the factfinder's to determine based on the testimony he hears and the entire record before him. See Brown v. Bowen, 794 F.2d 703, 706 (D.C. Cir. 1986); see also Chandler v. Comm'r of Soc. Sec., 668 F.3d 356, 362 (3d. Cir. 2011) ("The ALJ – not treating or examining physicians or State agency consultants – must make the ultimately disability and RFC determinations."). Here, the ALJ provided a detailed explanation for finding that Plaintiff's symptoms, while present, are not as functionally limiting as Plaintiff contends and as Drs. Grim and Nicholas found. Plaintiff invites

the Court to reweigh the evidence and arrive at a different conclusion. This Court, however, should not substitute its judgment for the ALJ's in this case. The ALJ's evaluation of Plaintiff's credibility is supported by substantial evidence in the record. Plaintiff must do more than point to a different conclusion that the ALJ could have reached to demonstrate that the ALJ's credibility determination was patently wrong. See Molina, 674 F.3d at 1111 (finding that if "the evidence is susceptible to more than one rational interpretation, [the Court] must uphold the [Commissioner's] findings if they are supported by inferences reasonably drawn from the record."). Absent this showing, the undersigned finds no reason to disturb the ALJ's credibility finding. The undersigned thus recommends deference to the ALJ's credibility determination because it is adequately explained in his decision and substantially supported by the record.

### C. The ALJ Did Not Err by Failing to Discuss the Support Cane Recommended by Dr. Manning

■ Plaintiff next contends that the ALJ failed to evaluate Dr. Manning's report that Plaintiff required the use of a cane and to include such a limitation in his RFC decision. Pl. Mot. at 7. Plaintiff's argument is without merit.

On July 11, 2011, Dr. Manning completed the portion of Plaintiff's application for MetroAccess paratransit service that was reserved for physician input. AR 328–31. On the form, question twelve asked whether Plaintiff "require[s] any of the following mobility aids listed in question 13": a manual wheel chair, support cane, portable oxygen, power wheelchair or scooter, crutches, walker, white cane, or other. Id. at 329. Dr. Manning did not respond to question twelve, but at question thirteen, he checked the box for "support cane" without any explanation as to whether

Plaintiff uses one habitually or only occasionally. Id.

■ Based on this conclusory representation alone, Plaintiff faults the ALJ for neither mentioning it in his analysis nor including a limitation for a hand-held assistive device in his RFC determination. Pl. Mot. at 7. Plaintiff is wrong. As a preliminary matter, there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). He is only prohibited "from ignoring an entire line of evidence that supports a disability finding." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2013) (internal quotations omitted). The undersigned is hard-pressed to find that Dr. Manning's assertion that Plaintiff requires the use of a support cane in a MetroAccess form falls into that category. This is especially so considering that the remainder of the record includes evidence to the contrary.

For instance, in completing her Function Report Form, Plaintiff herself represented that she does not require the use of a cane to walk. AR 225. Nor did she state in her hearing testimony that she requires the use of a cane to climb stairs, run errands, ride public transportation, etc. See id. at 42–64. Indeed, as Defendant correctly notes, Plaintiff does not argue in her motion that she does, in fact, use or require the use of a cane to walk. See Pl. Mot. at.7. Moreover, on November 11, 2011, consultative examiner Dr. Aleskow recorded in his medical report based on his examination of Plaintiff that she "does not require an assistive device." AR 348. He further noted that she has a normal gait.. Id. at 349. Consistent with this finding, Dr. Grim and Dr. Nicholas also reported that Plaintiff "requires no assistive device" and ambulates effectively with a normal gait. Id. at 73, 93. As there is no recommendation

for a support cane from any doctor who evaluated Plaintiff subsequent to Dr. Manning's completion of the MetroAccess form, it is little wonder the ALJ neither mentioned Dr. Manning's representation nor incorporated it into his RFC determination. The undersigned finds Plaintiff's argument unavailing.

### D. The ALJ Did Not Err in Considering Dr. Manning's Recommendation That Plaintiff Return to Light Duty Work

In a return to work form dated August 4, 2010, Dr. Manning checked a box indicating that, in a couple of weeks, Plaintiff could return to light duty work, as defined on the form. Id. at 287. Dr. Manning similarly recorded that Plaintiff was capable of returning to light duty work on several other occasions. Id. at 281, 283, 285, 290. Plaintiff contends that the ALJ erroneously relied on Dr. Manning's use of the term "light duty" work to determine that Plaintiff had the RFC to perform light work. Pl. Mot. at 8. This argument is also without merit.

Granted, Plaintiff correctly identifies that an ALJ may not assume that a medical source uses terms set forth in the SSA regulations and Rulings, such as "light work," in conformity with their meaning in the Social Security context. Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, SSR 96-5p, 1996 WL 374183, at *4. But, as discussed earlier, the ALJ's decision that Plaintiff is capable of performing light work is derived from the record as a whole. This includes the State agency physicians' assessments, Plaintiff's other treating physicians' medical opinions, Plaintiff's conservative treatment, Plaintiff's activities of daily living, and the testimony of both Plaintiff and the VE. It is not, as Plaintiff argues, informed solely by Dr. Manning's assessment that Plaintiff is

capable of performing light duty work. Fairly read, the ALJ referenced Dr. Manning's finding that Plaintiff could return to light duty work to illustrate that, according to her treating physician, Plaintiff's symptoms were not so debilitating as to preclude her from working. See AR 31. Indeed, "[n]othing in the ALJ's report suggests that he conflated the doctor['s] use of the term 'light duty' with the SSA definition of 'light work,' and the Court will not read an ambiguity into the record when none exists." Cunningham v. Colvin, 46 F. Supp. 3d 26, 34 (D.D.C. 2014). The undersigned thus finds that the ALJ did not erroneously rely on Dr. Manning's recommendation.

### E. The ALJ Provided a Narrative Discussion Supporting his Conclusion Regarding Plaintiff's RFC Determination

Plaintiff's final argument is that the ALJ failed to set forth a narrative discussion of Plaintiff's RFC. In particular, Plaintiff alleges that the ALJ did not provide a basis for finding Plaintiff capable of being productive for more than eighty percent of the workday. Again, the undersigned finds that Plaintiff's argument falls short of warranting a remand.

Social Security Ruling 96–8p requires that the ALJ's narrative discussion of a claimant's RFC:

> contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate; a resolution of any inconsistencies in the evaluation as a whole; and a logical explanation of the effects of the symptoms, ... on the individual's ability to work.

SSR 96–8p, 1996 WL 374184, at *7. Thus, it is insufficient for the ALJ to merely list

the claimant's medical history and then conclusively state the claimant's RFC. Williams v. Colvin, Civ. Action No. 14-972 (EGS), 2015 WL 5726811, at *5 (D.D.C. Sept. 30, 2015). Instead, the ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." Lane–Rauth, 437 F. Supp. 2d at 67 (quoting Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002)).

At the hearing, the ALJ asked the VE about a hypothetical person of similar age, training, education, and work experience as Plaintiff with both non-exertional and exertional limitations. AR 64. Acknowledging that, cumulatively, these limitations would result in some reduction of productivity, the ALJ asked the VE to identify what reduction in productivity would render the hypothetical individual employable. Id. at 64–65. The VE responded that a twenty percent reduction would render the hypothetical individual unemployable. Id. at 65. Conversely, an individual with more than eighty percent productivity could not return to Plaintiff's past relevant work but could perform other work at the unskilled, light and sedentary levels. Id. at 66. The ALJ, as the fact finder, then weighed the evidence and determined that Plaintiff had the RFC to perform light and sedentary work – that is, she could be productive for more than eighty percent of the work day. Id. at 21. The ALJ did not, however, find substantial evidence to support Plaintiff's contention that she is disabled under the regulations, or, put differently, faces a twenty percent reduction in productivity as a result of her impairments.

 Plaintiff contends that this finding is inadequately explained. Pl. Mot. 8–9. It is Plaintiff's burden, however, to prove that she is disabled within the meaning of the SSA. English v. Shalala, 10 F.3d 1080,

1082 (4th Cir. 1993). Similarly, it is Plaintiff's burden to provide at step four of the analysis "evidence that her impairments would reduce her productivity by 20%." Thompson v. Colvin, Civil No. TMD 13-3450, 2015 WL 1393562, at *7 (D. Md. Mar. 24, 2015). Absent such a showing, courts have found that the same argument Plaintiff asserts here fails. See Allen v. Colvin, Civil No. TMD 13-3886, 2015 WL 5009969, at *9 (D. Md. August 21, 2015) (rejecting the plaintiff's argument that substantial evidence did not support the ALJ's assessment that he would be able to remain productive more than eighty percent of the time because the plaintiff pointed to no evidence that his impairments would reduce his productivity by twenty percent and failed to point to any evidence not considered by the Commissioner that might have changed the finding); Mackie v. Colvin, Civil No. TMD 14-2599, 2016 WL 695817, at *7 (D. Md. Feb. 22, 2016) (same); Bird v. Colvin, No. CIV. TMD 13-2824, 2015 WL 1062040, at *10 (D. Md. Mar. 10, 2015) (same); Jeffries v. Astrue, No. 3:11–CV–806–HEH, 2012 WL 3866536, at *15 (E.D. Va. Aug. 21, 2012), report and recommendation adopted, No. 3:11CV806–HEH, 2012 WL 3851222 (E.D. Va. Sept. 5, 2012) (same). Here, Plaintiff points to no specific evidence beyond her own testimony that would contradict the ALJ's finding or would support a finding that her productivity level was reduced by twenty percent or more. Thus, her argument similarly fails. See Reid, 769 F.3d at 865 (finding the ALJ's determination was supported by the record, underscored by the fact that Plaintiff "failed to point to any specific piece of evidence not considered by the Commissioner that might have changed the outcome of his disability claim") (emphasis in original).

In any event, the undersigned finds that the ALJ included sufficient information to satisfy the narrative discussion require-

ment of the RFC determination. Specifically, the ALJ described Dr. Grim's and Dr. Nicholas' findings regarding Plaintiff's functional limitations – that Plaintiff had the functional ability to lift ten pounds frequently and twenty pounds occasionally, sit for six hours in an eight hour day, and stand or walk for six hours in an eight hour day. AR 74. He took note of their findings that Plaintiff's functional limitations are derived from Plaintiff's right knee, hip, and back pain. Id. But he also considered their findings that Plaintiff could ambulate effectively, did not require an assistive walking device, and could perform work that is less demanding than her past work. Id. at 77. In basing Plaintiff's RFC in part on Dr. Grim's and Dr. Nicholas' assessments, the ALJ explained that their findings were "not inconsistent" with Dr. Manning's prior assessment, id. at 31, and were "buttressed" by Dr. Onyike's subsequent assessment after the March 2012 diagnostic testing, id.

The ALJ also considered whether Plaintiff's own hearing testimony supported these findings. Id. Specifically, the ALJ reviewed Plaintiff's testimony on her activities of daily living without rose-tinted lenses. In other words, while he took note of Plaintiff's ability to use public transportation, he also considered that she sometimes experienced difficulty walking to the bus stop. Id. at 22. Similarly, while he considered that Plaintiff climbed approximately thirty-four stairs to enter and exit her apartment, he also considered her testimony that climbing stairs caused her pain and that she left her apartment only three times per week, so she did not have to climb the stairs on a daily basis. Id. at 22–23. Overall, though, he found that her activities of daily living confirmed that she was not as functionally limited as she contended. Id. at 24–25. Her daily routine and household chores – consisting of sorting laundry, cooking, cleaning, and occasionally shopping for groceries and clothing,

among other things – belie her claim that her symptoms are so disabling that she is unable to work. Id. at 23–24. On that basis, the ALJ made a rational determination that Plaintiff's assessment of her own living conditions was "not entirely credible" and explained the basis for his determination in a way the undersigned can readily follow.

The undersigned thus finds that the ALJ did more than simply list the evidence followed by a conclusory RFC determination. Rather, he considered the record as a whole and discussed which evidence he found credible and why. He clearly explained the relevance of Dr. Grim and Dr. Nicholas' assessments, which were not contradicted by any other opinion evidence in the record, and he provided a rational basis for finding that Plaintiff's claims regarding pain were not entirely credible. He further explained his finding that there is limited information in Plaintiff's medical record to support a disability finding. In light of this, the undersigned finds that the ALJ's narrative discussion of Plaintiff's RFC was consistent with the statutory obligation and free from error worthy of remand. Cf. Lane-Rauth, 437 F. Supp. 2d at 67 (finding that there was no "logical bridge" between the facts and the ALJ's conclusion because the ALJ simply listed all of the evidence without further explanation).

## CONCLUSION

For the reasons stated above, the undersigned recommends that the Court deny Plaintiff's motion for judgment of reversal and grant Defendant's motion for judgment of affirmance.

\* \* \* \* \*

The parties are hereby advised that failure to timely file objections to the findings and recommendations set forth in this report may waive the right of appeal from an

order of the District Court adopting such findings and recommendations. See Thomas v. Arn, 474 U.S. 140 (1985).

Date: June 6, 2016